# EXHIBIT B

FILED
02-24-2026
Anna Maria Hodges
Clerk of Circuit Court
2026CV001665
Honorable Timothy Witkowiak-22
Branch 22

**STATE OF WISCONSIN** **CIRCUIT COURT CIVIL DIVISION** **MILWAUKEE COUNTY**

LETICIA WOODS,
3540 N 15th St.,
Milwaukee, WI 53206

Plaintiff,

v.

UNIVERSITY OF PHOENIX
4035 South Riverpoint Parkway,
Phoenix, Arizona 85040

Defendant.

**SUMMONS**

Case No.: ________________

Classification Code: 30301

**Jury Trial Demanded**

To each person named above as a Defendant:

You are hereby notified that the Plaintiff named above has filed a lawsuit or other legal action against you. The complaint, which is attached, states the nature and basis of the legal action.

Within (45) days of receiving this summons, you must respond with a written answer, as that term is used in chapter 802 of the Wisconsin Statutes, to the complaint. The court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to the court, whose address is Milwaukee Country Clerk of Circuit Courts, 901 North 9th Street, Room 104, Milwaukee, WI 53233, and to John D. Blythin, Plaintiff's attorney, whose address is 3620 East Layton Avenue, Cudahy, WI 53110. You may have an attorney help or represent you.

If you do not provide a proper answer within (45) days, the court may grant judgment against you for the award of money or other legal action requested in the complaint, and you may lose your right to object to anything that is or may be incorrect in the complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated: February 24, 2026

Respectfully submitted,

By: *Electronically signed by Daut Ademi*

John D. Blythin (SBN 1046105)
Daut Ademi (SBN 1122701)
**ADEMI LLP**
3620 East Layton Avenue
Cudahy, Wisconsin 53110
jblythin@ademilaw.com
dademi@ademilaw.com
(414) 482-8000
(414) 482-8001 (FAX)

FILED
02-24-2026
Anna Maria Hodges
Clerk of Circuit Court
2026CV001665
Honorable Timothy
Witkowiak-22
Branch 22

**STATE OF WISCONSIN** **CIRCUIT COURT CIVIL DIVISION** **MILWAUKEE COUNTY**

| | |
|---|---|
| LETICIA WOODS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF PHOENIX<br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>Case No. _______________<br><br>Classification Code: 30301<br><br>JURY DEMAND |

Plaintiff Leticia Woods ("Plaintiff") brings this class action against Defendant University of Phoenix ("University of Phoenix" or "Defendant") for its failure to properly secure and safeguard Plaintiff's and Class Members' Personally Identifiable Information ("PII") stored within Defendant's information network.

## INTRODUCTION

1. Defendant provides credit reporting and consumer financing options to automotive dealerships nationwide.

2. Defendant acquired, collected, and stored Plaintiff's and Class Members' Personally Identifiable Information ("PII").

3. At all relevant times, Defendant knew or should have known, that Plaintiff and Class Members would use Defendant's services to store and/or share sensitive data, including highly confidential PII.

4. PII generally incorporates information that can be used to distinguish or trace an individual's identity, and is generally defined to include certain identifiers that do not on

their face name an individual, but that is considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers).

5. On or around November 21, 2025, Defendant identified suspicious activity on its network and later determined that it was the result of a cybersecurity incident.

6. Upon information and belief, unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' PII as hosted with Defendant, with the intent of engaging in the misuse of the PII, including marketing and selling Plaintiff's and Class Members' PII.

7. Defendant stored Plaintiff's and the Class members' sensitive data on its information network, which was exposed and compromised. This data includes, but is not limited to, names, dates of birth, Social Security numbers, account numbers, and credit information.

8. Defendant disregarded the rights of the Plaintiff and Class Members by failing to implement adequate and reasonable measures to safeguard their PII. The Defendant intentionally, willfully, recklessly, or negligently neglected to take available steps to prevent unauthorized data disclosure and failed to follow required protocols, policies, and procedures for encrypting data, even for internal use.

9. As a result, an unauthorized third party accessed and compromised the PII of the Plaintiff and Class Members. This malicious party likely intends to profit from the breach by defrauding the Plaintiff and Class Members in the future.

10. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are thus entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

11. The court has jurisdiction to grant the relief sought by the Plaintiff pursuant to Wis. Stat. § 801.05(3). Defendant's services were directed at Wisconsin residents in Wisconsin. Venue in Milwaukee County is proper because the claim arose in Milwaukee County. Wis. Stat. § 801.50.

12. This Court has personal jurisdiction over Defendant because Defendant conducts business in, and has sufficient minimum contacts with Wisconsin.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. A substantial part of the events giving rise to the claims alleged herein occurred within this judicial district.

## THE PARTIES

**Plaintiff Leticia Woods**

14. Plaintiff Leticia Woods is an adult individual and, at all relevant times herein, a resident residing in Milwaukee County.

15. Plaintiff's information was stored with Defendant as she was a former student with the University of Phoenix.

16. As required in order to obtain services from Defendant, Plaintiff provided Defendant with highly sensitive personal information, who then possessed and controlled it.

17. Upon information and belief, Plaintiff's information was among the data accessed by an unauthorized third party in the Data Breach.

18. At all times herein relevant, Plaintiff is and was a member of the Class.

19. Plaintiff was unaware of the Data Breach until her counsel in an unrelated action

brought it to her attention.

20. As a result, the Plaintiff suffered harm by losing time dealing with the consequences of the Data Breach. This includes, and continues to include, time spent verifying the breach's legitimacy and impact, exploring credit monitoring and identity theft insurance options, and closely monitoring her accounts for suspicious activity.

21. Defendant's breach also caused Plaintiff harm by exposing her to a substantial and imminent risk of future harm. Because the breach likely exposed her sensitive data, she faces a high risk of identity theft or fraud. Given the nature of the Defendant's clientele, it is also likely that some Class Members' exposed information has already been misused.

22. Plaintiff suffered actual injury through damages to and a decrease in the value of her PII, which she entrusted to the Defendant. This intangible property was compromised as a result of the Data Breach.

23. Plaintiff faces imminent harm due to the significantly increased risk of fraud, identity theft, and misuse of her PII. With her personal data now in the hands of unauthorized third parties or criminals, she is at a heightened risk of exploitation.

24. The Plaintiff has an ongoing interest in ensuring that her PII, which she believes is still stored in the Defendant's possession, is protected and safeguarded from future breaches.

**Defendant University of Phoenix.**

25. Defendant University of Phoenix, is a Delaware corporation with its principal place of business being located at 4035 South Riverpoint Parkway, Phoenix, Arizona 85040

26. Defendant is a private for-profit university that is accredited by the Higher Learning Commission. Defendant offers certificates and degrees at the certificate, associate, bachelor's, master's, and doctoral degree levels

## CLASS ACTION ALLEGATIONS

27. Plaintiff brings this nationwide class action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4):

> All individuals within the United States of America whose PII was exposed to unauthorized third-parties as a result of the data breach experienced by Defendant on or around October 25, 2025.

28. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

29. Plaintiff reserves the right to amend the above definitions or to propose subclasses in subsequent pleadings and motions for class certification.

30. Numerosity: A class action is the only available method for the fair and efficient adjudication of this controversy, as the members of the Class are so numerous that joinder of all members is impractical, if not impossible.

31. Commonality: Plaintiff and the Class Members share a community of interests in that there are numerous common questions and issues of fact and law which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

a. Whether Defendant had a legal duty to Plaintiff and the Class to exercise

due care in collecting, storing, using, and/or safeguarding their PII;

b. Whether Defendant knew or should have known of the susceptibility of its data security systems to a data breach;

c. Whether Defendant's security procedures and practices to protect its systems were reasonable in light of the measures recommended by data security experts;

d. Whether Defendant's failure to implement adequate data security measures allowed the Data Breach to occur;

e. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. How and when Defendant actually learned of the Data Breach;

h. Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of the PII of Plaintiff and Class Members;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

k. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages and/or whether injunctive, corrective and/or declaratory relief and/or accounting is/are appropriate as a result of

Defendant's wrongful conduct; and

l. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

32. Typicality: Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class sustained damages arising out of and caused by Defendant's common course of conduct in violation of law, as alleged herein.

33. Adequacy of Representation: Plaintiff in this class action is an adequate representative of the Class in that the Plaintiff has the same interest in the litigation of this case as the Class Members, is committed to the vigorous prosecution of this case and has retained competent counsel who are experienced in conducting litigation of this nature.

34. Plaintiff is not subject to any individual defenses unique from those conceivably applicable to other Class Members or the class in its entirety. Plaintiff anticipates no management difficulties in this litigation.

35. Superiority of Class Action: Since the damages suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation by each member make or may make it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein. Should separate actions be brought or be required to be brought, by each individual member of the Class, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants.

36. Manageability: The litigation of the class claims alleged herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates there would be no significant manageability problems with prosecuting this lawsuit as a class action. Adequate notice can be

given to Class Members directly using information maintained in Defendant's records.

37. Ascertainability: All members of the proposed Class are readily ascertainable. The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. Defendant has access to information regarding the individuals affected by the Data Breach, and has already provided notifications to some or all of those people. Using this information, the members of the Class can be identified, and their contact information ascertained for purposes of providing notice.

1. Particular Issues: Particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether a contract existed between Defendant and its employees made for the benefit of Plaintiff and Class Members, and the terms of that contract;

e. Whether Defendant breached the contract;

f. Whether Defendant adequately and accurately informed Plaintiff and Class Members their Private Information had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures

and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting its data security processes and vulnerabilities;

i. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members; and

j. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief due to Defendant's wrongful conduct

38. Policies Generally Appliable to the Class: Finally, class certification is also appropriate under Rule 23(b)(2) and (c). The Class is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to each of the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

39. Defendant, through uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole, including without limitation the following:

a. Ordering Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b. Ordering that, to comply with Defendant explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security and

monitoring measures, including, but not limited to the following:

(i) prohibiting Defendant from engaging in the wrongful and unlawful acts alleged herein;

(ii) requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

(iii) requiring Defendant to delete and purge the Private Information of Plaintiff and Class Members unless it can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

(iv) requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' Private Information;

(v) requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

(vi) prohibiting Defendant from maintaining Private Information on a cloud-based database until proper safeguards and processes are implemented;

(vii) requiring Defendant to segment data by creating firewalls and access controls so that, if one area of its network is compromised, hackers cannot gain access to other portions of Defendant's systems;

(viii) requiring Defendant to conduct regular database scanning and securing checks;

(ix) requiring Defendant to monitor ingress and egress of all network traffic;

(x) requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiff and Class Members;

(xi) requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor its networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated;

(xii) requiring Defendant to meaningfully educate all Class Members about the threats that they because of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves; and

(xiii) Incidental retrospective relief, including but not limited to restitution.

## FACTUAL ALLEGATIONS

**Defendant's Business**

40. Plaintiff and Class Members are current and former students, faculty, staff, and suppliers of Defendant's.

41. As a condition of its relationships with Plaintiff and Class Members, Defendant required that Plaintiff and Class Members entrust Defendant with highly sensitive and confidential PII.

42. Defendant acquired, collected, and stored and assured reasonable security over Plaintiff's and Class Members' PII.

43. Indeed, Defendant's Privacy Policy provides, in relevant part, that:

> ***We have implemented security measures to protect against the loss, misuse, and alteration of the Personal Information under our control***. However, no data transmission over the Internet can be guaranteed to be completely secure. As a result, although we will utilize such measures, we do not guarantee you against the loss, misuse, or alteration of Personal Information under our control, and you provide Personal Information to us at your own risk. You should always take care how you handle and disclose your Personal Information and should avoid sending Personal Information through insecure email, Social Networks, or other Internet channels.

(Emphasis added).

44. Plaintiff and Class Members provided their PII to Defendant, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

45. Plaintiff and Class Members provided their PII to Defendant, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

46. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

47. Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of its systems. Defendant has a legal duty to keep consumer's PII safe and

confidential.

48. Defendant had obligations created by FTC Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

49. Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Defendant could not perform the services it provides.

50. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

**Defendant Had an Obligation to Protect the Stolen Information**

51. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

52. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Plaintiff and Class Members.

53. Defendant owed a duty to Plaintiff and Class Members to design, maintain, and test its computer systems, servers, and networks to ensure that the PII was adequately secured and protected.

54. Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the PII in its possession, including not sharing information with other entities who maintained sub-standard data security systems.

55. Defendant owed a duty to Plaintiff and Class Members to implement processes that would immediately detect a breach in its data security systems in a timely manner.

56. Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

57. Defendant owed a duty to Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to entrust this PII to Defendant.

58. Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

59. Defendant owed a duty to Plaintiff and Class Members to encrypt and/or more reliably encrypt Plaintiff's and Class Members' PII and monitor user behavior and activity in order to identify possible threats.

**Value of the Relevant Sensitive Information**

60. PII are valuable commodities for the "cyber black market." Criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites.

61. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details

have a price range of $50 to $200.[1] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[2] Other sources report that criminals can also purchase access to entire company data breaches from $999 to $4,995.[3]

62. Identity thieves can use PII, such as that of Plaintiff and Class Members, which Defendant failed to keep secure, to perpetrate a variety of crimes that harm victims—for instance, identity thieves may commit various types of government fraud such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, using the victim's information to obtain government benefits, or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

63. There may be a time lag between when harm occurs vers us when it is discovered, and also between when PII is stolen and when it is used: according to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data might be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[4]

64. Here, Defendant knew of the importance of safeguarding PII and of the

---

[1] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed February 26, 2024).

[2] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed March 27, 2025).

[3] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed March 27, 2025).

[4] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* http://www.gao.gov/new.items/d07737.pdf (last accessed March 27, 2025).

foreseeable consequences that would occur if Plaintiff's and Class Members' PII were stolen, including the significant costs that would be placed on Plaintiff and Class Members as a result of a breach of this magnitude.

65. As detailed above, Defendant is a sophisticated organization with the resources to deploy robust cybersecurity protocols. It knew, or should have known, that the development and use of such protocols were necessary to fulfill its statutory and common law duties to Plaintiff and Class Members. Therefore, its failure to do so is intentional, willful, reckless and/or grossly negligent.

66. Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (ii) failing to disclose that they did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and Class Members' PII; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

**<u>Data Breaches Are Preventable</u>**

67. Defendant could have prevented this Data Breach by, among other things, properly encrypting PII on its network or otherwise ensuring that such PII was protected while in transit or accessible.

68. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer

needed.

69. The unencrypted PII of Class Members will end up for sale to identity thieves on the dark web, if it has not already, or it could simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

70. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection." [5]

71. To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent shing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

[5] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited July 7, 2025).

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[6]

72. To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

[6] *Id.* at 3-4.

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[7]

73. Given that Defendant was storing the PII of its current and former employees and clients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

**<u>Defendant Knew or Should Have Known of the Risk Because Companies In Possession Of PII Are Particularly Suspectable To Cyber Attacks</u>**

74. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting companies that collect and

---

[7] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited July 7, 2025).

store PII, like Defendant, preceding the date of the breach.

75. Data thieves regularly target companies like Defendant's due to the highly sensitive information that they custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

76. In 2021 alone, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[8]

77. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[9]

78. As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

79. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including,

---

[8] *Id.*

[9] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last accessed June 30, 2025).

specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

80. In fact, Defendant is well aware of the consequences of data breaches given its 2019 data breach which impacted approximately 4.9 million customers.[10]

81. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

82. The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen fraudulent use of that information and damage to victims may continue for years.

83. As a company in possession of its current and former employees' and clients' PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

**Defendant Failed to Comply with FTC Guidelines**

84. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice"

[10] https://www.idtheftcenter.org/post/steps-to-take-after-doordash-data-breach/

in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

85. In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

86. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

87. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

88. These FTC enforcement actions include actions against companies like

Defendant.

89. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

90. Defendant was at all times fully aware of its obligation to protect the PII of its employees and clients yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**Defendant Failed to Comply with Industry Standards**

91. As noted above, experts studying cybersecurity routinely identify companies like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

92. Some industry best practices that should be implemented by companies dealing with sensitive PII, like Defendant, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

93. Other best cybersecurity practices that are standard include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff

regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

94. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

95. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**The Data Breach Increases Victims' Risk of Identity Theft**

96. Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

97. The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

98. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

99. Because a person's identity is akin to a puzzle with multiple data points, the more

accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

100. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or shing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

101. One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.

102. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

11

103. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII

[11] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last accessed on July 7, 2025).

to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

104. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

105. The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

106. Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

107. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**Loss of Time to Mitigate Risk of Identity Theft and Fraud**

108. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been

lost.

109. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's Notice instructs,[12] "remain vigilant" and monitor their financial accounts for many years to mitigate the risk of identity theft.

110. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach.

111. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record." [13]

112. These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports. [14]

113. And for those Class Members who experience actual identity theft and fraud, the

---

[12] Office of Vermont Attorney General, *Data Breach Notice to Consumers*, https://ago.vermont.gov/sites/ago/files/documents/2025-06-30%20Johnson%20Controls%20Data%20Breach%20Notice%20to%20Consumers.pdf.

[13] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[14] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2025).

United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record." [15]

**Diminution Value of PII**

114. PII is a valuable property right.[16] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

115. An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion. [17]

116. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. [18,19]

117. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year. [20]

118. Conversely sensitive PII can sell for as much as $363 per record on the dark web

---

[15] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed June 30, 2025) ("GAO Report").

[16] *See, e.g.,* Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[17] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed July 7, 2025).

[18] https://datacoup.com/ (last accessed July 7, 2025).

[19] https://worlddataexchange.com/about (last accessed July 7, 2025).

[20] Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed July 7, 2025).

according to the Infosec Institute.[21]

119. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

120. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

121. The fraudulent activity resulting from the Data Breach may not come to light for years.

122. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

123. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to thousands of individuals'

---

[21] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 77, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed July 7, 2025).

detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

124. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

**Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary**

125. Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

126. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that to unemployment benefits were filed for until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

127. Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

128. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

**<u>Loss of the Benefit of the Bargain</u>**

129. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for products and/or services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received products and/or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## <u>CLAIMS FOR RELIEF</u>

### <u>COUNT ONE</u>
### Negligence
### (On behalf of the Class)

130. Plaintiff realleges and reincorporates every allegation set forth in the preceding paragraphs as though fully set forth herein.

131. At all times herein relevant, Defendant owed Plaintiff and Class Members a duty of care, *inter alia*, to act with reasonable care to secure and safeguard their PII and to use commercially reasonable methods to do so. Defendant took on this obligation upon accepting and storing the PII of Plaintiff and Class Members in its computer systems and on its networks.

132. Among these duties, Defendant was expected:

a. to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession;

b. to protect Plaintiff's and Class Members' PII using reasonable and adequate security procedures and systems that were/are compliant with industry-standard practices;

c. to implement processes to detect the Data Breach quickly and to timely act on warnings about data breaches; and

d. to promptly notify Plaintiff and Class Members of any data breach, security incident, or intrusion that affected or may have affected their PII.

133. Defendant knew that the PII was private and confidential and should be protected as private and confidential and, thus, Defendant owed a duty of care not to subject Plaintiff and Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

134. Defendant knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of its data security systems, and the importance of adequate security.

135. Defendant knew about numerous, well-publicized data breaches.

136. Defendant knew, or should have known, that its data systems and networks did not adequately safeguard Plaintiff's and Class Members' PII.

137. Only Defendant was in the position to ensure that its systems and protocols were sufficient to protect the PII that Plaintiff and Class Members had entrusted to it.

138. Defendant breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard their PII.

139. Because Defendant knew that a breach of its systems could damage thousands of individuals, including Plaintiff and Class Members, Defendant had a duty to adequately protect its data systems and the PII contained therein.

140. Plaintiff's and Class Members' willingness to entrust Defendant with their PII

was predicated on the understanding that Defendant would take adequate security precautions.

141. Moreover, only Defendant had the ability to protect its systems and the PII is stored on them from attack. Thus, Defendant had a special relationship with Plaintiff and Class Members.

142. Defendant also had independent duties under state and federal laws that required Defendant to reasonably safeguard Plaintiff's and Class Members' PII and promptly notify them about the Data Breach. These "independent duties" are untethered to any contract between Defendant, Plaintiff, and/or the remaining Class Members.

143. Defendant breached its general duty of care to Plaintiff and Class Members in, but not necessarily limited to, the following ways:

a. by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members;

b. by failing to timely and accurately disclose that Plaintiff's and Class Members' PII had been improperly acquired or accessed;

c. by failing to adequately protect and safeguard the PII by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PII;

d. by failing to provide adequate supervision and oversight of the PII with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII of Plaintiff and Class Members, misuse the PII and

intentionally disclose it to others without consent.

e. by failing to adequately train its employees not to store PII longer than absolutely necessary;

f. by failing to consistently enforce security policies aimed at protecting Plaintiff's and the Class Members' PII;

g. by failing to implement processes to detect data breaches, security incidents, or intrusions quickly; and

h. by failing to encrypt Plaintiff's and Class Members' PII and monitor user behavior and activity in order to identify possible threats.

144. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

145. As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiff and Class Members have suffered damages and are at imminent risk of additional harms and damages.

146. The law further imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of the PII to Plaintiff and Class Members so that they could and/or still can take appropriate measures to mitigate damages, protect against adverse consequences and thwart future misuse of their PII.

147. Defendant breached its duty to notify Plaintiff and Class Members of the unauthorized access by waiting months after learning of the Data Breach to notify Plaintiff and Class Members and then by failing and continuing to fail to provide Plaintiff and Class Members sufficient information regarding the breach.

148. To date, Defendant has not provided sufficient information to Plaintiff and Class

Members regarding the extent of the unauthorized access and continues to breach its disclosure obligations to Plaintiff and Class Members.

149. Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiff and Class Members, Defendant prevented Plaintiff and Class Members from taking meaningful, proactive steps to secure their PII.

150. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm suffered, or risk of imminent harm suffered by Plaintiff and Class Members.

151. Plaintiff's and Class Members' PII was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

152. Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

153. The damages Plaintiff and Class Members have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

154. As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the

Data Breach, including but not limited to, efforts spent researching how to prevent, detect, contest, and recover from embarrassment and identity theft; (vi) the continued risk to their PII, which may remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

155. As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

156. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and are subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

**<u>COUNT TWO</u>**
**Breach of Implied Contract**
**(On behalf of the Class)**

157. Plaintiff realleges and reincorporates every allegation set forth in the preceding paragraphs as though fully set forth herein.

158. Through its course of conduct, Defendant, Plaintiff and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and

protect the privacy of Plaintiff's and Class Members' PII.

159. Defendant required Plaintiff and Class Members to provide and entrust their PII as a condition of obtaining Defendant's services.

160. Defendant solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices.

161. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

162. As a condition of their relationship with Defendant, Plaintiff and Class Members provided and entrusted their PII to Defendant.

163. In so doing, Plaintiff and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such non-public information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

164. A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their PII to Defendant, in exchange for, amongst other things, the protection of their PII.

165. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

166. Defendant breached its implied contracts with Plaintiff and Class Members by failing to safeguard and protect their PII and by failing to provide timely and accurate notice to them that their PII was compromised as a result of the Data Breach.

167. As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) (a)

ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non-economic harm.

**COUNT THREE**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On behalf of the Class)**

168. Plaintiff realleges and reincorporates every allegation set forth in the preceding paragraphs as though fully set forth herein.

169. Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

170. Plaintiff and Class Members have complied with and performed all conditions of their contracts with Defendant.

171. Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of PII and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

172. Defendant acted in bad faith and/or with malicious motive in denying Plaintiff and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

**COUNT FOUR**
**Unjust Enrichment**
**(On behalf of the Class)**

173. Plaintiff realleges and reincorporates every allegation set forth in the preceding paragraphs as though fully set forth herein.

174. By its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Plaintiff and Class Members.

175. Defendant, prior to and at the time Plaintiff and Class Members entrusted their PII to Defendant, caused Plaintiff and Class Members to reasonably believe that Defendant would keep such PII secure.

176. Defendant was aware, or should have been aware, that reasonable patients and consumers would have wanted their PII kept secure and would not have contracted with Defendant, directly or indirectly, had they known that Defendant's information systems were sub-standard for that purpose.

177. Defendant was also aware that, if the substandard condition of and vulnerabilities in its information systems were disclosed, it would negatively affect Plaintiff's and Class Members' decisions to seek services therefrom.

178. Defendant failed to disclose facts pertaining to its substandard information systems, defects, and vulnerabilities therein before Plaintiff and Class Members made their decisions to make purchases, engage in commerce therewith, and seek services or information.

179. Instead, Defendant suppressed and concealed such information. By concealing and suppressing that information, Defendant denied Plaintiff and Class Members the ability to make a rational and informed purchasing and servicing decision and took undue advantage of Plaintiff and Class Members.

180. Defendant was unjustly enriched at the expense of Plaintiff and Class Members, as Defendant received profits, benefits, and compensation, in part, at the expense of Plaintiff and

Class Members; however, Plaintiff and Class Members did not receive the benefit of their bargain because they paid for products and or services (or provided those services) that did not satisfy the purposes for which they bought/sought them.

181. Since Defendant's profits, benefits, and other compensation were obtained improperly, Defendant is not legally or equitably entitled to retain any of the benefits, compensation or profits it realized from these transactions.

182. Plaintiff and Class Members seek an Order of this Court requiring Defendant to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Defendant from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of herself and each member of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's favor and for the following specific relief against Defendant as follows:

1. That the Court declare, adjudge, and decree that this action is a proper class action and certify the proposed class under Wis. Stat. § 803.08 (2)(a), (2)(b), or (2)(c), including the appointment of Plaintiff's counsel as Class Counsel;

2. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

3. That the Court enjoin Defendant, ordering them to cease from unlawful activities;

4. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class

Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

5. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an Order:

a. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

b. requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

c. requiring Defendant to delete and purge the PII of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

d. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII;

e. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems periodically;

f. prohibiting Defendant from maintaining Plaintiff's and Class Members' PII on a cloud-based database;

g. requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

h. requiring Defendant to conduct regular database scanning and securing checks;

i. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and Class Members;

j. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

k. requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to monitor Defendant's networks for internal and external threats appropriately, and assess whether monitoring tools are properly configured, tested, and updated; and

l. requiring Defendant to meaningfully educate all Class Members about the threats they face due to the loss of their confidential personal identifying information to third parties, as well as the steps affected

individuals must take to protect themselves.

6. For prejudgment interest on all amounts awarded, at the prevailing legal rate;

7. For an award of attorney's fees, costs, and litigation expenses, as allowed by law; and

8. For all other Orders, findings, and determinations identified and sought in this Complaint.

**JURY DEMAND**

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury for all issues triable by jury.

Dated: February 24, 2026, Respectfully submitted,

**ADEMI LLP**

By: *Electronically signed by Daut Ademi*

Shpetim Ademi (SBN 1026973)
John D. Blythin (SBN 1046105)
Daut Ademi (SBN 1122701)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
sademi@ademilaw.com
jblythin@ademilaw.com
dademi@ademilaw.com
(414) 482-8000
(414) 482-8001 (FAX)

*Attorneys for Plaintiff and the Class*